IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| BULK EXPRESS, INC. and ) <br> CHRISTOPHER PAWLIKOWSKI ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> RICHARD L. DWYER, DWYER RISK ) <br> MANAGEMENT, INC., d/b/a DRM, INC., ) <br> BETTY L. JOHNSON and APEC ) <br> INVESTMENT GROUP, INC., ) <br> ) <br> Defendants. ) | No. 2:04 CV 182 <br><br> Judge Philip P. Simon |

**OPINION AND ORDER**

When Chris Pawlikowski sent $250,000 to Betty Johnson for an investment that purported to return $5 million per month, things seemed too good to be true. They were of course. Johnson never invested Pawlikowski's money at all, and instead, she frittered it away leaving Pawlikowski holding the empty bag. Before the Court is Plaintiffs' Motion for Summary Judgment against Johnson and others, which the Court now grants.

**FACTUAL BACKGROUND**

Plaintiff Christopher Pawlikowski is an Indiana resident, and president of Plaintiff Bulk Express, Inc. ("BEI"), a trucking company. Defendant Richard Dwyer is also an Indiana resident and president of Defendant Dwyer Risk Management, Inc. ("DRM"), an Indiana corporation. Dwyer and Pawlikowski have been neighbors for a number of years and, from time to time, they played golf together. Defendant Betty Johnson is a California resident and the president, secretary, and treasurer of Defendant Apec Investment Group, Inc. ("AIGI"), a

1

Nevada corporation.  Johnson and Dwyer have known each other for several years and have had business dealings regarding their respective companies.  Johnson and Dwyer communicated with one another multiple times via telephone, facsimile, and United States mail regarding the events alleged below.  (Plaintiffs' Ex. 1 at ¶ 16).

Near the end of 2001, Dwyer began to talk to Pawlikowski about certain offshore trading schemes he was involved in and about the possibility of investing through Betty Johnson, a trader whom he claimed had an "excellent" reputation.  (Plaintiffs' Ex. 33 at 38, 43, 46).  If the investment was successful, Dwyer hoped that Pawlikowski would give him a piece of land to build a house on.  (Plaintiffs' Ex. 33 at 43).  On or about April 23, 2002, while Dwyer and Pawlikowski were golfing together, Dwyer again brought up the subject of a Betty Johnson investment program, telling Pawlikowski that a "window of opportunity" had opened in a program that would pay an extremely high return on funds in a short period of time.  (Plaintiffs' Ex. 33 at 43, 45).  Dwyer further represented that he himself (or his company DRM) would be investing $250,000 in this "High-Yield Investment Program" ("HYIP"), and that there was an opportunity for Pawlikowski to invest his own funds in the same program.  (Plaintiffs' Ex. 33, at 46, 47).  Dwyer never informed Pawlikowski about any risks associated with the HYIP. (Plaintiffs' Ex. 33 at 48).

Initially, Pawlikowski declined to participate in the program, but changed his mind while on vacation, and contacted Dwyer to inform him that he would transfer the funds in a couple of days.  However, Dwyer insisted that the HYIP opportunity would be lost unless the funds were transferred immediately.  (Plaintiffs' Ex. 1 at ¶ 22).  In accordance with Dwyer and Johnson's instructions, on May 16, 2002, Pawlikowski had his father arrange for a wire transfer of

$250,000 from the bank account of BEI to the "Triton Comp, Inc." account of Johnson and AIGI.  (Plaintiffs' Ex. 2 at ¶ 10; Ex. 3; Ex. 11 at ¶ 7; Ex. 17 at ¶ 7-8).

Pawlikowski inquired about his HYIP shortly after he returned from vacation, and Dwyer assured Pawlikowski that Betty Johnson "was working on the program and getting it done." (Plaintiffs' Ex. 33 at 67).  Dwyer also provided Pawlikowski with a document prepared by Johnson, dated April 30, 2002, that purported to be an "Agreement" between AIGI and DRM. Pursuant to the Agreement AIGI would obtain a "Bank Guarantee" from Banco de Brazil and pay both DRM and Pawlikowski monthly "trading profits."

The best evidence that this investment was too good to be true, was the representation in the Agreement that the trading profits would amount to an absurd $5 million per month on Pawlikowski's $250,000 investment.  (Plaintiffs' Ex. 4 at 2-3).  The agreement also falsely stated that DRM had provided $250,000 in "funding."  (Plaintiffs' Ex. 3; Plaintiffs' Ex. 12 at ¶ 12). Although there was a signature line for Pawlikowski at the bottom of the document, labeled "CLIENT," Pawlikowski never signed this agreement.  (Plaintiffs' Ex. 11 at ¶ 16).

Johnson later stated that she wrote the agreement after learning that Dwyer had secured funding from Pawlikowski. (Plaintiffs' Ex. 35 at 88)  Johnson drafted the agreement "from memory," based on her experience as a legal secretary.  (Plaintiffs' Ex. 35 at 88-89).  She also conceded that the agreement was purposely written in vague language, to prevent Pawlikowski from learning the specific details of the proposed transaction.  (Plaintiffs' Ex. 35 at 303-04, 313).

Between June and November, 2002, Dwyer and Johnson continued to assure Pawlikowski that everything remained "on course" for the program, and that any delays were because people were "lined up to get into the program."  (Plaintiffs' Ex. 33 at 70).  Defendants also provided Pawlikowski with three separate fax transmissions, on June 15, October 1, and

November 6, each of which stated that the funds necessary for the project would soon be available. (Plaintiffs' Ex. 5; Ex. 6; Ex. 7).

Pawlikowski continued to make inquiries regarding the HYIP between November, 2002 and October, 2003, and in a number of instances, requested the return of his funds. (Plaintiffs' Ex. 2 at ¶ 14). Dwyer persisted in assuring Pawlikowski that he was in regular telephone contact with Johnson and AIGI, and that even if the HYIP didn't work out, Pawlikowski's funds would be placed in another program with similar returns. (Plaintiffs' Ex. 2 at ¶ 14; Plaintiffs' 33 at 79-82). Pawlikowski accepted these representations as true, as he believed that DRM and Dwyer had also invested funds in the HYIP and were in a position similar to Pawlikowski. (Plaintiffs' Ex. 2 at ¶ 14).

Johnson continued to reassure Pawlikowski in an August, 2003 conference call. Johnson told Pawlikowski that there were problems with the HYIP, but that he wasn't going to lose his money and it would be placed in another investment program. (Plaintiffs' Ex. 2 at ¶ 15; Ex. 33 at 98-99). In either October or November, 2003, Dwyer provided Pawlikowski with a document entitled "Forty Week Program," explaining that this was a new investment program into which Johnson and AIGI were trying to place Pawlikowski's funds. (Plaintiffs' Ex. 1 at ¶ 36; Ex. 8). Like the "Agreement" for the HYIP, this document was prepared by Johnson and AIGI in California, and sent to Dwyer and DRM in Indiana. (Plaintiffs' Ex. 1 at ¶ 36).

In reality, Pawlikowski's funds were never placed in any HYIP or Forty Week Investment Program. Instead, almost immediately after the funds were transferred to the bank account specified by Johnson on May 16, 2002, Johnson directed her accountant, Jeffrey Sykes, to disburse more than $110,000 of Pawlikowski's funds to herself and other individuals. (Plaintiffs' Ex. 23 at JS 0001 – JS 0015; Ex. 36 at 37-47). Johnson's stated purposes for the

4

disbursements included "bank fees," "screen costs," and "advanced fees." (Plaintiffs' Ex. 23 at JS 0001 – JS 0015; Ex. 35 at 114, 369). While she was staying in Las Vegas, Johnson later directed Sykes to transfer an additional $60,000 to her account in Nevada. (Plaintiffs' Ex. 35 at 362). This process continued until April, 2003, when all funds in the account were completely exhausted. (Plaintiffs' Ex. 23 at JS 0015). At no point did Johnson ever direct Sykes to place Pawlikowski's $250,000 into any sort of investment program. (Plaintiffs' Ex. 36 at 48).

On March 19, 2004, Pawlikowski issued a demand letter to Defendants, demanding the return, plus two years interest, of his $250,000 payment. (Plaintiffs' Ex. 1 at ¶ 38). On April 21, 2004, a follow up demand letter was sent. (Plaintiffs' Ex. 1 at ¶ 38). Eight days later, Pawlikowski and BEI brought this action, alleging securities fraud under Securities and Exchange Commission Rule 10b-5, control person liability under section 20(a) of the Securities and Exchange Act, and a variety of pendent claims under Indiana state law, including state law securities violations, common law fraud, conversion, money had and received, unjust enrichment, and civil conspiracy.

On April 30, 2004, one day after Plaintiffs filed suit, AIGI, Johnson, DRM and Dwyer signed a joint letter advising Pawlikowski that "we do hereby agree to the repayment of funds to reimburse Mr. Pawlowski[sic]" and that "[t]here was never a period of time that we did not intend for Mr. Pawlikowski to get repaid on this transaction." (Plaintiffs' Ex. 25). Pawlikowski never received the funds promised by Defendants. (Plaintiffs' Ex. 2 at ¶ 20).

On June 27, 2005, Plaintiffs moved for summary judgment. Plaintiffs' Notice of Motion for Summary Judgment properly informed Defendants of their obligation to respond to the motion, in accordance with *Kincaid v. Vail*, 969 F.2d 594, 599 (7th Cir. 1992); and *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir. 1982). Despite this notice, Defendants did not meaningfully

respond to Plaintiffs' Motion for Summary Judgment. In August 2005, Defendants Johnson and Dwyer each submitted a one-page response entitled "Motion to Deny Summary Judgment." Both responses state only that Defendants intend to offer a cash settlement, and that "[d]efendants are requesting a jury trial to determine the amount of funds the *defendant* is entitled to receive in this matter." (emphasis supplied). Neither response sets forth any disputed material fact regarding Plaintiffs' claims, nor do they cite to any discovery responses, affidavits, depositions, or other admissible evidence. Nor does either response contain any "Statement of Genuine Issues."

On August 26, 2005, Plaintiffs filed their reply. On October 11, 2005, the Court issued an order, giving Defendants one last chance to respond meaningfully to Plaintiffs' motion on or before October 25, 2005. October 25th came and went without Defendants supplementing their prior responses.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). A genuine dispute about a material fact exists only if the evidence is such that a

reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

To help determine whether a genuine issue of material fact exists, Local Rule 56.1 directs the moving party to file a "Statement of Material Facts" as to which "the moving party contends there is no genuine issue." N.D. Ind. L.R. 56.1(a). The party opposing a summary judgment motion must respond to each of the purported undisputed facts with a "'Statement of Genuine Issues' setting forth, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence, all material facts to which it is contended there exists a genuine issue to be litigated." *Id.* The Local Rule states that "the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the 'Statement of Genuine Issues' filed in opposition to the motion." N.D. Ind. L.R. 56.1(b); *see also Thiele v. Norfolk & Western Ry. Co.*, 873 F. Supp. 1240, 1243 (N.D. Ind. 1994).

Defendants have not disputed any of the facts set forth in Plaintiffs' Statement of Material Facts, despite being given ample opportunity to do so. Thus, the facts laid out in Plaintiffs' Rule 56.1 Statement of Material Facts are deemed admitted unless they are unsupported by the evidence or contradict each other. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[w]e have consistently held that a failure to respond by the nonmovant as required by local rules results in an admission"); *Michas v. Health Cost Controls of Ill., Inc.* 209 F.3d 687, 689 (7th Cir. 2000) (same).

Nevertheless, even where an opposing party completely fails to respond to a summary judgment motion, Rule 56(e) permits judgment for the moving party only "if appropriate - that is, if the motion demonstrates that there is no genuine issue of material fact *and* that the movant

is entitled to judgment as a matter of law." *P.S. Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) (quoting *Tobey v. Extel/JWP, Inc.* 985, F.2d 330, 332 (7th Cir. 1993)).  In other words, the court still must ascertain that judgment is proper "as a matter of governing law." *Id.* (citations omitted).  For this reason, we will analyze each of Plaintiffs' claims to determine whether judgment is proper.

### B. Federal Securities Claims

To prove a violation of Securities and Exchange Commission Rule 10b-5, the plaintiff must demonstrate that: (1) defendants made false statements or omissions; (2) of material fact; (3) with scienter; (4) regarding the sale or purchase of securities; (5) upon which the plaintiff justifiably relied; and which proximately caused the plaintiff's damages.  17 C.F.R. § 240.10b-5 (2005); *In re Healthcare Compare Corp. Securities Litigation*, 75 F.3d 276, 280 (7th Cir. 1996); *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

Under the theory of control person liability, a "control person" is jointly and severally liable in suit for a violation of the Securities and Exchange Act.  15 U.S.C. § 78t(a) (2000).  To prove that someone is a control person, the plaintiff must establish that the control person actually exercised general control over the wrongdoer, and that this control person had the power, even if not exercised, to control the specific transaction resulting in liability.  *Donohoe v. Consolidated Operating & Production Corp.*, 30 F.3d 907, 911-912 (7th Cir. 1994).  Indirect means of discipline and influence, even if short of actual direction, can be sufficient to hold a control person liable, provided that the control person was involved in the operations of the wrongdoing entity in general, and possessed the power to exercise control over the specific transaction.  *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir. 1996); *see also Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996).

Based on the undisputed facts presented by Plaintiffs, DRM, Dwyer, AIGI and Brown are each jointly and severally liable for violating SEC Rule 10b-5. Defendants admit that Pawlikowski's investment in the HYIP was a security. (Plaintiffs' Ex. 1 at ¶ 43); *see also SEC v. Lauer*, 52 F.3d 667, 670-71 (7th Cir. 1996). In soliciting Pawlikowski to participate in the HYIP, Defendants knowingly made several material misrepresentations, including the expected returns on HYIP investments, the need to supply funds immediately in order to participate in the HYIP, that Pawlikowski's funds would be placed into the HYIP, that Dwyer had invested $250,000 of his own (or DRM's) funds in the program, and the fact that a legitimate HYIP existed at all. Pawlikowski justifiably relied on all of these representations when he decided to invest his funds into the HYIP, and as a result, lost the entirety of his investment. Thus, Defendants' misrepresentations in violation of SEC Rule 10b-5 proximately caused Plaintiffs' damages.

Furthermore, under the theory of control person liability, Dwyer, DRM, AIGI and Johnson are each jointly and severally liable for Plaintiffs' damages. As an owner and president of DRM, Dwyer had the power to direct DRM's management and policies, and he exercised this power to cause DRM to engage in the illegal conduct described above. Accordingly, under Section 20(a), Dwyer was a culpable participant in the SEC violation perpetuated by himself and DRM. Similarly, as secretary, treasurer, and an owner of AIGI, Johnson had the power to direct AIGI's management and policies, and she exercised this power to cause AIGI to engage in the illegal conduct described above. Thus, Johnson too is a culpable participant under Section 20(a).

**C. State Law Claims**

In addition to his federal securities claims, Plaintiffs also bring several claims under Indiana state law, including conversion, money had and received, fraud, unjust enrichment, violation of Indiana securities laws, and civil conspiracy. We address these claims in turn.

*1. Conversion and Money Had and Received*

Criminal conversion occurs when "a person knowingly or intentionally exerts unauthorized control over the property of another person." Ind. Code § 35-43-4-3 (2004). Proof of conversion requires a showing that any control asserted was unauthorized, and that the defendant was aware of the high probability that control was unauthorized. *Manzon v. Stant Corp.*, 138 F. Supp. 2d 1110, 1115 (S.D. Ind. 2001). Control is unauthorized if it is exerted without consent, or if it is exerted in a manner that exceeds the authorization given. *Star Bank, N.A. v. Laker*, 626 N.E.2d 466, 469 (Ind. App. 1993), *rev'd in part on other grounds.* Under Indiana law, a party who suffers a loss as a result of criminal conversion may recover up to treble damages, reasonable attorneys fees, and the costs of the action. Ind. Code § 34-24-3-1 (2004). A criminal conviction is not required to find civil liability for conversion; the plaintiff need only prove each element by a preponderance of the evidence. *Northern Electric Co. v. Torma*, 819 N.E.2d 417, 429 (Ind. App. 2004).

An action for money had and received is an equitable remedy enforced when a plaintiff has a right to possess money that is in the possession of the defendant, when in justice and good conscience, the defendant ought to pay the money to the plaintiff. *Watson v. Sears*, 766 N.E.2d 784, 790 (Ind. App. 2002). Essentially, the claim rests upon an implied promise by a person who received money from the plaintiff, which under the circumstances he should not retain. *Shelby Engineering Co. v. Action Steel Supply*, 707 N.E.2d 1026, 1028 (Ind. App. 1999).

The undisputed facts place Defendants' conduct squarely within the definition of conversion, as well as money had and received. Defendants were aware that Pawlikowski transferred his $250,000 to Defendants for the purposes of placing the funds into an HYIP. When Defendants failed to place Pawlikowski's funds into an HYIP, and used the money for other purposes, they knowingly controlled the funds beyond the scope of Pawlikowski's authorization. Pawlikowski's multiple demand letters and requests for the return of his funds further put Defendants on notice that their control was unauthorized, indicating that they are liable for the tort of conversion. As Defendants are still in wrongful possession of Pawlikowski's funds, they are also liable under the equitable remedy of money had and received.

*2. Common Law Fraud*

A claim for common law fraud requires proof that a party (1) made a material representation; (2) of past or existing facts; when (3) the representation was false; and (4) made with knowledge or reckless ignorance of its falsity; and (5) the plaintiff relied on the representation to his detriment. *Autoxchange.com, Inc. v. Dreyer & Reinbold, Inc.*, 816 N.E.2d 40, 51 (Ind. App. 2004). As stated above, Defendants each knowingly made multiple misrepresentations to Pawlikowski, including the expected returns on the HYIP investment, that Pawlikowski's funds would be placed into the HYIP, that Dwyer had invested $250,000 of his own (or DRM's) funds in the program, and the fact that a legitimate HYIP existed at all. Once Pawlikowski had surrendered control of his funds, Defendants continued to make misrepresentations, such as the assertions made in the HYIP Agreement, the "any day now" assurances in the faxes provided by Johnson and Dwyer, and the reassurances that Pawlikowski was not in any danger of losing his money. Pawlikowski relied on all these representations to his detriment both when he decided to invest his funds into the HYIP, and when he allowed his

11

funds to remain in the control of Defendants, which eventually cost him the entirety of his investment.

### 3. Unjust Enrichment

Unjust enrichment occurs when a measurable benefit is conferred on the defendant, such that retention of that benefit without payment would be unjust. *Bayh v. Sonnenburgh*, 573 N.E.2d 398, 408 (Ind. 1991). Typically, unjust enrichment applies to the conferral of goods or services. *See Galanis v. Lyons & Fruitt*, 715 N.E.2d 858, 861 (Ind. App. 1999) (stating that the theory of unjust enrichment permits a party to recover "the 'value of work performed or material furnished if used' by another and if valuable") (quoting 17A C.J.S. Contracts § 440 at 553 (1963)). Nevertheless, unjust enrichment also applies to the undisputed facts here. When Pawlikowski transferred his $250,000 to Defendants, they received a tangible benefit. Instead of investing Pawlikowski's money into an HYIP, Defendants used the money for their own personal purposes, while continually lying to Pawlikowski about the status of his investment. In this situation, Defendants' retention of Pawlikowski's money without repayment constitutes unjust enrichment.

### 4. State Law Securities Violation

In addition to the federal securities claims discussed above, Plaintiffs also seek damages under Indiana Code § 23-2-1-19, a state securities statute. To recover damages under this provision, a plaintiff must establish that Defendants offered or sold a security "in violation of this chapter" and the plaintiff must not have knowingly participated in, nor had knowledge of, the underlying securities violation. Ind. Code § 23-2-1-19(a) (2004); *see also Thomas v. Hemmelgarn*, 579 N.E.2d 1333, 1337 (Ind. App. 1991). The statute further provides for control person liability. *See* Ind. Code § 23-2-1-19(d) (2004).

Although Plaintiffs do not cite to an underlying violation, Defendants' actions violated Indiana Code § 23-2-1-12, which is virtually identical to SEC Rule 10b-5. Ind. Code. § 23-2-1-12 (2004). As stated previously, Defendants each knowingly made several material misrepresentations in connection with the HYIP and Plaintiffs did not have knowledge of, or participate in, the violation. In addition, Johnson and Dwyer also had the power to direct their respective companies' management and policies, and each exercised this power to cause their companies to engage in the illegal conduct described above. Therefore, Johnson and Dwyer are each personally liable as "control persons" under Indiana Code § 23-2-1-19(d).

   5.   *Civil Conspiracy*

Plaintiffs' final claim is civil conspiracy. A civil conspiracy exists when two or more persons engage in concerted action to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. *Boyle v. Anderson Fire Fighters Assoc. Local 1262*, 497 N.E.2d 1073, 1079 (Ind. App. 1986). Existence of a civil conspiracy creates no cause of action in and of itself; rather, it is a mechanism to hold all parties to the conspiracy jointly and severally liable for damages caused. *Id*.

Based on the undisputed facts before us, Dwyer and Johnson conspired among themselves and their respective corporations. Dwyer and DRM each provided material aid to Johnson and AIGI by convincing Pawlikowski to invest in the HYIP, and arranging for his funds to be sent to California. Johnson and AIGI similarly aided Dwyer and DRM by providing documentation of the investment scheme, and providing instruction and faxes to deflect Pawlikowski's inquiries about the legitimacy of the scheme. As a result of these combined efforts, Defendants defrauded Pawlikowski and BEI of $250,000. Therefore, each defendant is jointly and severally liable for any damages suffered by Plaintiffs.

### D.      Damages

If no genuine issues of material fact exist, a court may grant summary judgment on the issue of damages. Fed. R. Civ. P. 56(d) (allowing the grant of summary judgment for "the amount of damages or other relief not in controversy"); *see also Publisher's Resource, Inc. v. Walker-Davis Publications, Inc.*, 762 F.2d 557, 558-59 (7th Cir. 1985); *Parallax Power Supply L.L.C. v. Victory Components, Inc.*, 2005 WL 2086047 (N.D. Ind. 2005) (awarding monetary damages, treble damages, attorneys fees, and costs after defendant failed to respond to plaintiff's summary judgment motion). Defendants have not presented any genuine issue of material fact regarding damages.

Plaintiffs ask the court for judgment in the amount of $250,000, for "funds converted, misappropriated, and obtained by fraud," treble damages in the amount of $750,000, punitive damages in the amount of $500,000, attorney fees in excess of $150,000, and all costs and interest on misappropriated funds allowed by law.

By prevailing on their federal securities claims, as well as state law claims for conversion, money had and received, fraud, state securities law violations, unjust enrichment, and civil conspiracy, Plaintiffs are entitled to recover $250,000 in actual damages jointly and severally against all Defendants.

Indiana Code § 34-24-3-1 provides that a plaintiff who suffers a loss as a result of conversion may recover (1) damages up to three times the amount of actual damages, (2) the costs of the action, and (3) reasonable attorneys fees. Ind. Code. § 34-24-3-1 (2004). Recovery under this section does not require a criminal conviction, so long as the plaintiff demonstrates, by a preponderance of the evidence, that a criminal act was committed. *Northern Electric*, 819 N.E.2d at 429. Once the plaintiff establishes the elements of criminal conversion, the statute

mandates the award of attorneys' fees.  *Burgett v. Haynes*, 572 N.E.2d 1296, 1298-99 (Ind. App. 1991).  The award of treble damages is left to the discretion of the trial court.  *Id.*; *see also Gilliana v. Paniaguas*, 708 N.E.2d 895, 900 (Ind. App. 1999) (awarding treble damages under Indiana Code § 34-24-3-1 when a contractor made material misrepresentations during the construction of a backyard swimming pool).  The undisputed facts described above establish beyond question that Johnson, with the assistance of Dwyer, committed a criminal conversion of Pawlikowski's money.  Accordingly, the Court awards Plaintiffs treble damages in the amount of $750,000, reasonable attorneys fees, and the costs of this action in accordance with Ind. Code §34-24-3-1.

Plaintiffs have not submitted a bill of costs or attorneys fees.  Therefore, Plaintiffs are directed to file and serve a bill of costs and attorneys' fees within thirty (30) days of the date of this Order.  Defendants shall submit any objection to the bill of costs and attorneys' fees within fifteen (15) days after receipt of same.

Although Plaintiffs make a general demand for punitive damages, their motion papers do not address the standard for punitive damages under Indiana law or why Plaintiffs are entitled to them.  Therefore, the Court declines to award Plaintiffs any punitive damages.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is **GRANTED**. Plaintiffs are awarded $250,000 actual damages, treble damages in the amount of $750,000, and reasonable costs and attorneys fees. Plaintiffs are ordered to file and serve a bill of costs and attorneys' fees within thirty (30) days of the date of this Order. Defendants are ordered to file and serve any objections to the bill within fifteen (15) days of service.

**SO ORDERED.**

ENTERED:   November 17, 2005

                                               s/ Philip P. Simon
                                               PHILIP P. SIMON, JUDGE
                                               UNITED STATES DISTRICT COURT